# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––

**No. ACM 38943**

––––––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Evan G. SMITH**
Captain (O-3), U.S. Air Force, *Appellant*

––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 14 July 2017

––––––––––––––––––

*Military Judge:* Mark W. Milam.

*Approved sentence:* Dismissal. Sentence adjudged 11 July 2015 by GCM convened at Joint Base San Antonio-Lackland, Texas.

*For Appellant:* Major Jarett Merk, USAF; Major Thomas A. Smith, USAF.

*For Appellee:* Major Mary Ellen Payne, USAF; Major Meredith L. Steer, USAF; Captain Matthew L. Tusing, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, HARDING, and C. BROWN, *Appellate Military Judges.*

Judge HARDING delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge C. BROWN joined.

––––––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

––––––––––––––––––

HARDING, Judge:

Contrary to his pleas, a general court-martial consisting of a military judge convicted Appellant of one specification of assault consummated by a

battery upon a child under 16 years of age; one specification of perjury by giving false testimony; and one specification of child endangerment by culpable negligence in violation of Articles 128, 131, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 928, 931, 934.[1] The military judge sentenced Appellant to a dismissal.

On appeal, Appellant raises the following assignments of error: (1) the evidence is factually and legally insufficient to sustain his perjury conviction; (2) the evidence is factually insufficient to sustain his conviction for assault consummated by a battery upon a child under 16 years of age;[2] and (3) the military judge's excepting out "on divers occasions" rendered his finding of guilty for child endangerment under the Additional Charge and its Specification ambiguous, thereby precluding this court's review under Article 66, UCMJ, 10 U.S.C. § 866.

As to Appellant's first assignment of error, we agree that the evidence is factually insufficient and grant relief. As to Appellant's third assignment of error, we agree that under the circumstances of this case, the military judge's finding of guilty except the words "on divers occasions" rendered the verdict fatally ambiguous and grant relief. Finding no further error, we affirm the remaining conviction.

## I. BACKGROUND

Appellant and SS married in December 2010. SS was previously married to MC and had two daughters with him. After her divorce from MC, SS maintained primary custody of their daughters. Once married to Appellant, SS and her two daughters lived with him. Appellant and SS subsequently had two sons of their own, HS born on 17 June 2011 and BS born on 16 September 2012. KF, SS's mother, lived with Appellant, SS, and their children at various times between Appellant's and SS's marriage and 2 December 2013.

Relevant to the child endangerment specification, KF testified to three occasions where Appellant placed a newly-born BS onto a changing table. The specification was based on these instances and alleged that Appellant "did, on divers occasions, endanger the mental health, physical health, safety, and

---

[1] The military judge acquitted Appellant of one specification of damaging non-military property; one specification of rape by using force; one specification of forcible sodomy; one specification of assault consummated by a battery; and one specification of assault consummated by a battery upon a child under 16 years of age in violation of Articles 109, 120, 125, and 128, UCMJ, 10 U.S.C. §§ 909, 920, 925, 928.

[2] Raised pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

welfare of BS by throwing and dropping him, and that such conduct consti-tuted culpable negligence." At trial, KF recalled these events occurring be-tween the middle of September 2012, shortly after BS was born, and the end of October 2012.[3] The first instance described by KF occurred when BS was two weeks old. KF did not directly observe this incident but testified her daughter SS had, in a very animated state, told her "*I can't believe that MFer dropped my son.*" KF asked her daughter what she meant. KF testified her daughter repeated the statement of disbelief, but KF could not recall whether she said "dropped" or "tossed" the baby but that it was one or the other. KF then asked her daughter what happened. According to KF, SS then described that Appellant had thrown their son onto the changing table specifically at-tributing the word "throw," "threw," or "thrown" to SS's descriptions of Appel-lant actions six times during her testimony.

Contrary to the testimony of her mother, SS testified that she had no memory or recollection of Appellant "dropping" their newborn son. She fur-ther denied that she ever told her mother that Appellant "dropped" him. SS did, however, testify that she remembered a conversation about the general topic of Appellant changing his diaper. SS went on to describe an occasion where Appellant had wrapped his son in a blanket after bathing him and then placed him on the changing table. SS further testified that after Appel-lant had unraveled him from the blanket there was a "little blup" when their newborn son was placed on the changing pad. The changing pad was de-scribed by SS as being concave with four inches of padding thickness around the sides or perimeter and sloping down to two inches of padding thickness at the center. After additional questioning by trial counsel, SS testified that "when [Appellant] pulled out the towel, [BS] just dropped a little on the changing table." SS agreed, "if she had to put a measurement on it," that the drop was a couple of inches but she "[did not] consider a little two-inch drop an abuse." SS stated that she "got after" Appellant about this because "he wasn't as secure as [she] wanted him to be" and further stated that being post-partum she "would get after [Appellant] over anything at that time." SS furthered testified that she believed that BS was about three months old when the "blup" happened.[4] On cross-examination, SS also used the term "bomp" to describe how her son was placed on the changing table after Appel-lant removed the blanket. Upon questioning from the military judge, SS clari-

---

[3] The child endangerment specification alleged that the events took place "between on or about 16 September 2012 and on or about 30 November 2012."

[4] This would be approximately 16 December 2012 and thus technically 16 days out-side the charged time-frame.

fied that Appellant's removal of the blanket did not result in her baby being placed down on the changing pad after spinning or twisting. "It [sic] more a plop."

KF, in addition to relaying what she claimed her daughter told her happened when BS was two weeks old, described two occasions when she herself witnessed Appellant place his son on the changing table in manner she disagreed with. When BS was three weeks old, KF looked into the nursery from about twenty feet away in the kitchen and observed Appellant place his son on the changing table with what "looked more like a toss than a drop." She further described the "toss" being accomplished by "more of a, a downward force" and later agreed with the answer suggested in trial counsel's question that Appellant had "tossed [him] down" onto the changing table. She estimated that the distance covered over the "toss" was a foot in height. KF testified that when BS was five weeks old, she observed Appellant and BS in the nursery as she was walking out of the laundry room. KF testified that Appellant used the same kind of "downward toss" to place BS on the changing table as before.

In early October 2013 Appellant spanked HS, who was two years old at the time, and left a bruise on his thigh and buttocks. SS took photographs of the bruising and sent them via her phone to KF. Additionally, on 25 October 2013 Texas Child Protective Services (CPS) initiated an investigation into an allegation that Appellant has spanked HS for throwing food. CPS also had been informed that as a result of the spanking, there were pictures that showed bruising on his buttocks and leg. On 29 October 2013, JL, the CPS investigator, interviewed Appellant about the allegation. Appellant confirmed to JL that he had spanked HS for throwing food from his high chair. Appellant further told JL that he had spanked HS with an open hand and saw some redness. JL did not have the pictures of the bruises at the time he interviewed Appellant and thus did not specifically ask Appellant if he had caused the injuries depicted in the pictures.

Meanwhile, by the fall of 2013, the results of an investigation of allegations of sexual assault against Appellant had been provided to Appellant's squadron commander. The allegations related to Appellant's interactions with a female Airman when Appellant was assigned at Shaw Air Force Base, South Carolina, in 2009. At that time, Appellant held the rank of Senior Airman. On 4 November 2013, charges and specifications[5] alleging rape by un-

---

[5] These charges and specifications were investigated at the December 2013 Article 32 hearing and subsequently dismissed. Substantially the same charges and specifica-

*(Footnote continues on next page)*

lawful force and forcible sodomy were preferred against Appellant. Appellant's commander personally informed Appellant by reading verbatim to him the preferred charges and specifications that same day.

The events that took place in October and early November 2013, the CPS child abuse investigation into the spanking of HS and the preferral of sexual assault charges against Appellant, were part of the impetus for, and focus of, a child custody hearing regarding SS's two daughters in early December. Their father, MC, had been provided information from both SS's brother and mother, GF and KF, regarding the CPS investigation into the spanking and bruising and MC used that information in support of an effort to change the custody arrangement regarding his daughters. Furthermore, by the date of the hearing, MC and his attorney were generally aware of the allegation of sexual assault against Appellant and that a hearing was scheduled in the middle of December related to that allegation. A pretrial investigative hearing under Article 32, UCMJ, 10 U.S.C. § 832, was in fact scheduled for 13 December 2013.

On 2 December 2013, the civil hearing was held at the 345th Civil District Court of Travis County, Texas, to address a motion filed by MC wherein MC sought to gain primary custody of his daughters. Appellant testified and was asked the following question by MC's attorney:

> Lieutenant, are you presently looking at a hearing here in the next several weeks to determine whether you should stand charged with a sexual assault?

Appellant immediately answered: "No, sir," before SS's attorney could make an objection based on relevance. In response to the objection, MC's attorney offered that the evidence was relevant "as to whether or not that has an impact on the stress there at the house." The judge overruled the objection and admitted the evidence. Appellant was then asked whether he had given a deposition in "the case" to which Appellant replied "No, sir. There is no case right now, sir." MC's attorney then asked: "Is the idea of an allegation of sexual assault simply something that's been made up out of entire whole cloth? There is no basis?" Appellant replied as follows:

> That is why they chose not to prosecute at this time, yes, sir. There is no evidence or there is no—there is no statement. There is no evidence that anything of that has taken place for

---

tions were preferred anew on 19 June 2014 along with other charges and specifications that were subsequently referred to this court-martial.

the individual who was discharged. This person was discharged from the military. I'm one of five members they had filed a complaint against. The prosecution did not pick up the case. It moves to an Article 32 for a dismissal.

The following colloquy then ensued between MC's attorney and Appellant:

MC's Attorney: So in fact, there was an allegation. That was my question.

Appellant: No. You did not say "allegation," sir. You said I was charged; and then you used the term "case," correct?

MC's Attorney: Has there been an allegation? Was there an allegation of sexual assault?

Appellant: There was an allegation.

MC's Attorney: Thank you very much.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of the evidence supporting the perjury conviction and the factual sufficiency of the evidence supporting the conviction for assault consummated by a battery upon a child under 16 years of age. We review both legal and factual sufficiency de novo. *United States v. Beatty*, 64 M.J. 456, 459 (C.A.A.F. 2007). The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term "reasonable doubt" does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). As with legal sufficiency, the term "reason-

able doubt" "does not mean that the evidence must be free of conflict." *United States v. Galchick*, 52 M.J. 815, 818 (A.F. Ct. Crim. App. 2000).

### 1. Perjury

To sustain the conviction for perjury as alleged in the specification, the Government was required to prove: (1) that Appellant took an oath that he would testify truly in a judicial proceeding by a court of competent jurisdiction, to wit: the 345th Civil District Court of Travis County, Texas; (2) that the oath was administered to Appellant in a matter in which an oath was required or authorized by law; (3) that the oath was administered by a person having authority to do so; (4) that upon the oath, Appellant did, at or near Austin, Texas, on or about 2 December 2013, willfully, corruptly, and contrary to such oath, testify in substance that he was not facing a hearing to determine whether he should stand charged with a sexual assault; (5) that the testimony was upon a material matter; (6) that the testimony was false; and (7) that Appellant did not then believe the testimony to be true.[6]

In the context of perjury and false swearing, the United States Court of Appeals for the Armed Forces has held "that a statement which is technically, literally, or legally true cannot support a conviction, even if misleading or confusing." *United States v. Evans*, 37 M.J. 468, 471 (C.M.A. 1993). Likewise, when dealing with ambiguous statements, "doubts as to the meaning of allegedly false testimony should be resolved in favor of truthfulness." *Id.* (internal quotation marks and citations omitted). "[L]iterally true but unresponsive answers are to be remedied through more precise questioning." *United States v. Arondel de Hayes*, 22 M.J. 54, 55–56 (C.A.A.F. 1986) (citing *Smith v. United States,* 169 F.2d 118 (6th Cir.1948); *United States v. Abrams,* 568 F.2d 411 (5th Cir. 1978); *United States v. Haimowitz,* 725 F.2d 1561 (8th Cir. 1984); *United States v. Purgess*, 33 C.M.R. 97 (C.M.A. 1963)).

The question and follow-up questions asked of Appellant were hardly a model of precision. As a result, one is left to ponder the meaning of Appellant's answer of "no." Appellant was not simply asked whether he had an upcoming hearing concerning a sexual assault allegation. If he had been asked such a simple question and flatly denied there was a hearing, we would not detain ourselves long in resolving this alleged error in the Government's favor. The question posed to Appellant, however, was not so simple. Appellant was not only asked "whether he was looking at a hearing . . . in the next several weeks," he was also asked within the same question if the hearing's purpose was "to determine whether he should stand charged with a sexual as-

---

[6] *See Manual for Courts-Martial, United States* (*MCM*), pt. IV, ¶ 57(b)(1) (2012).

sault." MC's attorney asked a compound question—answering "yes" would have been agreeing not only that there was an upcoming hearing, but that the Article 32 hearing's purpose is "to determine" the disposition of an allegation or report of an offense under the UCMJ. Were such a proposition presented to a gathering of military justice practitioners, we would expect a substantial number to disagree outright or inquire as to what meaning to attach to the word "determine" and the words "stand charged."

The attorney's use of the word "determine" only injected more potential for confusion regardless of whether Appellant answered yes or no. The word "determine" used in the context of the question asked could have reasonably been understood to mean to decide. As Appellant points out, rather than "determine" or decide disposition, the stated purposes of an Article 32, UCMJ, pretrial investigation at that time was to conduct an "inquiry as to the truth of the matter set forth in the charges, consideration of the form of the charges, and recommendation as to the disposition which should be made in the interest of justice and discipline."[7] A disposition decision and recommendation are distinctly different. A statement that an Article 32 hearing's purpose is "to determine" the disposition of a sexual assault offense is at best ambiguous.

Finally, the determination to be made according to the question was whether Appellant would "stand charged" with a sexual assault. MC's attorney did not clarify if by the words "stand charged" he meant to be charged in the first place—an initial disposition resulting in a preferral of charges—or whether Appellant would continue to "stand charged" by means of a referral of previously preferred charges to a court-martial. Of course, if the reference was to an initial disposition decision, the hearing would in no way factor into that determination or decision.

Given the question asked by MC's attorney, the substance of Appellant's response of "no" was "I am not presently looking at a hearing here in the next several weeks to determine whether I should stand charged with a sexual assault." If that statement is "technically, literally, or legally true," then it cannot support Appellant's conviction, "even if misleading or confusing." If the term "determine" were limited to meaning "decide" and the words "stand charged" to an initial decision to prefer charges, then unquestionably Appellant's statement would technically be true and thus could not support a perjury charge. We find Appellant's response to be an ambiguous answer to an

---

[7] Effective 26 December 2014, Article 32, UCMJ, changed from a pretrial investigation to a preliminary hearing.

imprecisely worded and poorly constructed question.[8] After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are not convinced of Appellant's guilt beyond a reasonable doubt and thus find the evidence factually insufficient. Accordingly, we set aside and dismiss the perjury charge and specification.

### 2. Assault Consummated by a Battery upon a Child under Sixteen Years of Age

To sustain the conviction for assault consummated by a battery upon a child under 16 years of age as alleged in the specification, the Government was required to prove: (1) that Appellant did bodily harm to [HS]; (2) that Appellant did so by striking HS on the buttocks and thigh with his hand; (3) that the bodily harm was done with unlawful force or violence; and (4) that [HS] was then a child under the age of sixteen years.[9] At the child custody hearing, Appellant was asked whether he had "any serious doubt" that the marks on HS's buttocks were the result of a spanking that he gave. Appellant replied, "No, no serious doubt." The photographs taken by SS demonstrate the nature and extent of the bodily harm to HS's buttock and thigh and Appellant admitted to the CPS investigator that he spanked HS with an open hand after HS had thrown his food. Having reviewed the entire record of trial and making allowances for not personally observing the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

### B. Ambiguous Findings

Appellant avers that the military judge's finding with respect to the specification of child endangerment was fatally ambiguous. As indicated above, we agree.

When the phrase "on divers occasions" is removed from a specification, the effect is "that the accused has been found guilty of misconduct on a single occasion and not guilty of the remaining occasions." *United States v. Augspurger,* 61 M.J. 189, 190 (C.A.A.F. 2005). "If there is no indication on the record which of the alleged incidents forms the basis of the conviction, then the findings of guilt are ambiguous and the Court of Criminal Appeals cannot perform a factual sufficiency review." *United States v. Wilson*, 67 M.J. 423, 428 (C.A.A.F. 2009) (citing *United States v. Walters,* 58 M.J. 391, 396–97

---

[8] We note that MC's attorney likely achieved his objective of ultimately eliciting from Appellant that he had been alleged to have committed a sexual assault and did not have as a concern a potential perjury prosecution against Appellant.

[9] *See MCM*, 2012, pt. IV, ¶ 54.b(3)(c).

(C.A.A.F. 2003)). "Where the findings do not disclose the single occasion on which the conviction is based, the Court of Criminal Appeals cannot conduct a factual sufficiency review or affirm the findings because it cannot determine which occasion . . . the servicemember was acquitted of." *Augspurger*, 61 M.J. at 190. "Double jeopardy principles prohibit a reviewing court from rehearing any incidents for which the accused was found not guilty." *Wilson*, 67 M.J. at 428. "Courts of Criminal Appeals may not perform an independent review of the record to determine which of the possible incidents most likely formed the basis for the conviction." *Id.* However, a Court of Criminal Appeals may review the record to determine if there was only a single possible incident that met "all the details of the specification" for which an appellant was convicted. *Id.* at 429.

The military judge found Appellant guilty of the specification except the words "on divers occasions," "the mental health," and "throwing." Thus the specification that Appellant was found guilty of by the military judge was modified to the following by the exceptions:

> [B]etween on or about 16 September 2012 and on or about 30 November 2012, had a duty for the care of [BS], a child under the age of 16 years, and did, endanger physical health, safety, and welfare of said [BS] by dropping him, and that such conduct constituted culpable negligence, such conduct being to the prejudice of good order and discipline in the armed forces and of a nature to bring discredit upon the armed forces.

Notably, the military judge did not find Appellant guilty of any substituted or additional words. Nor did he make a clarification on the record as to which alleged incident formed the basis of the conviction as is permitted by Rule for Courts-Martial (R.C.M.) 922(d).[10] The Government asserts that the finding of guilt as to the child endangerment charge was not ambiguous because the instance described by SS as a "blup," "bomp," and "plop" is the only single incident that meets all the details for the specification for which Appellant was convicted. This assertion is rather remarkable given the Government's characterization dismissing this evidence in its closing argument:

> The Additional Charge is child endangerment, sir. We have that happening from when the boy is born essentially up until

---

[10] In the context of a judge-alone trial, clarification of ambiguous findings can be accomplished by a clear statement on the record by the military judge as to which alleged incident formed the basis of the conviction. *United States v. Trew*, 68 M.J. 364 (C.A.A.F. 2010).

the end of November. That gives you the whole range. And the two months where SS either lied about or talked about something that doesn't really matter much; the dropping of the boy. And then you have the actual charged offenses that fall under there; three occasions. One where [SS] comes out in an excited utterance, in spite of her ability almost preternatural to get up here and lie and scheme and misdirect, and tells her mom what she saw happen in a fit, in a flurry of excitement, a fear of concern for the safety of her two-week-old son, who flails as he is thrown down by the accused. That is the first. We have the second. We have the third as well that [KF] observed herself.

On appeal, the Government has retreated from the incident based upon the excited utterance and now in an effort to salvage the finding of guilty, embraces the "blup" as the only single possible incident that met "all the details of the specification" for which Appellant was convicted. The Government argues that this is the case because this was the only instance where there was no evidence of "throwing" or endangerment to "mental health" and this matched the excepted language Appellant was found not guilty of. We disagree.

We note that by the time both sides had rested their respective cases, the evidence supported four distinct instances wherein Appellant might be found to have endangered his child's physical health, safety, and welfare by culpable negligence. Those instances are as follows:

(1) KF testified that when BS was two weeks old, SS made an excited utterance to her "I can't believe that MFer dropped my son" and also used the word "throw";

(2) KF testified that when BS was three weeks old, she observed a "downward toss" while standing in the kitchen;

(3) KF testified that when BS was five weeks old, she observed a "downward toss" while walking from the laundry room toward the nursery; and

(4) SS testified that when BS was three months old, she observed the "blup" which she estimated to be a "drop" of a couple of inches.

The military judge found the manner in which Appellant endangered his son was by "dropping him." For two of the four instances the word "drop" was actually used in the testimony to describe what Appellant did. We also note that the word "drop" is not a term with a precise legal definition and can generally be used to describe letting or making something fall vertically. KF's description of a "downward toss" is not incompatible with a finding of "dropping." Having reviewed the record, we find evidence for all four incidents that meet "all the details of the specification" for which Appellant was convicted.

11

We are therefore unable to conclude that there is only one single possible occasion that meets all the details of the specification for which Appellant was convicted. As a result, the findings for the child endangerment charge and specification are fatally ambiguous and we are unable to perform a factual sufficiency review under Article 66, UCMJ.

The Government argues in the alternative that if this court were to hold that the findings were ambiguous, instead of dismissing the charge, we should remedy the ambiguity by remanding for special findings. However:

> Because double jeopardy principles would bar any rehearing on incidents of which Appellant was found not guilty, and because ambiguous findings preclude distinguishing incidents that resulted in acquittal from the single incident that resulted in a conviction, the remedy for a *Walters* violation is to set aside the finding of guilty to the affected specification and dismiss it with prejudice.

*United States v. Scheurer*, 62 M.J. 100, 112 (C.A.A.F. 2005). Accordingly, we set aside and dismiss the child endangerment charge and specification.

**C. Sentence Reassessment**

Having set aside and dismissed the charges and specifications for perjury and child endangerment, we now must decide whether we can accurately reassess Appellant's sentence based solely upon the findings on the affirmed conviction for assault consummated by a battery upon a child under 16 years of age or instead if we must return this case for a rehearing.

This court has "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Our superior court has repeatedly held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). In determining whether to reassess a sentence or order a rehearing, we consider the totality of the circumstances with the following as illustrative factors: (1) dramatic changes in the penalty landscape and exposure; (2) the forum; (3) whether the remaining offenses capture the gravamen of the criminal conduct; (4) whether significant or aggravating circumstances remain admissible and relevant; and (5) whether the remaining offenses are the type with which we as appellate judges have the experience and familiarity to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15–16.

Examining the entire case and applying the considerations set out in *Winckelmann*, we are unable to determine to our satisfaction that Appellant's

sentence would have been at least as severe as a dismissal or some lesser form of punishment without the error. The penalty landscape has dramatically changed as the maximum imposable sentence to confinement has been reduced from 8 years to 2 years. Further, the remaining offense does not capture the gravamen of the criminal conduct. Clearly, the military judge considered the child endangerment conviction in crafting the sentence of a dismissal along with the other "child abuse" conviction as well as the perjury. It is notable that with the child endangerment conviction as a matter to consider in sentencing, there was arguably an emerging pattern of child abuse. Trial counsel argued about the "grave danger that [BS] was put in when he was dropped by his own father at a few weeks old" and that HS, "for throwing food at two years old received a beating worse than probably some of us have obtained in our lives." He also made repeated references to how Appellant had failed to protect them. Without the child endangerment conviction, the assault and battery for spanking HS could be characterized as a one-time event where a parent lost their temper and went beyond what the law permits in terms of corporal punishment. Standing alone, it does not capture an emergent pattern of abuse, a significant part of the gravamen of the criminal conduct regarding Appellant's treatment of his children.

As for the perjury specification, in his sentencing argument trial counsel made a direct link between Appellant's failure to "respect" the oath he made at the child custody hearing and its bearing on whether he would respect the oath he made as an officer in the Air Force. Trial counsel stated that when he thought of Appellant and his crimes "[he saw] dishonor, shame, disgrace, and untrustworthiness," and that "his crimes earned him that dismissal." As the military judge sentenced Appellant to a dismissal and no other form of punishment, once child endangerment and perjury are no longer before the sentencing authority, we hesitate to conclude Appellant's sentence would have been at least as severe as a dismissal or some lesser form of punishment without the error.

**D. Timely Appellate Review**

Although not initially raised by Appellant, we review de novo "[w]hether an appellant has been denied [his] due process right to a speedy post-trial review . . . and whether [any] constitutional error is harmless beyond a reasonable doubt." *United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F. 2006). A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed before this court. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). The *Moreno* standards continue to apply as a case remains in the appellate process. *United States v. Mackie*, 72 M.J. 135, 135–36 (C.A.A.F. 2013). When a case is not completed within 18 months, such a delay is presumptively un-

reasonable and triggers an analysis of the four factors elucidated in *Barker v. Wingo*, 407 U.S. 514 (1972), and *Moreno. See United States v. Arriaga*, 70 M.J. 51, 55 (C.A.A.F. 2011). Those factors are "(1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant." *United States v. Mizgala*, 61 M.J. 122, 129 (C.A.A.F. 2005); *see also Barker*, 407 U.S. at 530.

This case was originally docketed with the court on 30 December 2015. As such, the delay in releasing our decision is facially unreasonable. However, in analyzing the *Barker* factors for the delay leading up to this decision, we find no due process violation resulted from the appellate delay. Regarding the reasons for the delay, we note Appellant's brief was not filed until 22 May 2017, nearly 17 months after the case was docketed with this court. The Government's answer was filed on 21 June 2017. Appellant's counsel requested a total of eight enlargements of time, all of which were granted. In each instance, Appellant counsel noted that Appellant was not in confinement, there were 14 motions at trial, and that the transcript is 2238 pages with 37 prosecution exhibits, 16 defense exhibits, and 88 appellate exhibits. Appellant did not make a demand for speedy appellate review.

Notably, on 10 January 2017, this court ordered the Government to submit a sealed Appellate Exhibit for attachment to the record after a determination it was missing from the court's copy. On 31 January 2017, the Government notified the court that the missing exhibit was not part of the record maintained by either party. On motion of the Government, we remanded the case to the convening authority for correction setting 11 April 2017 as the deadline for the correction. On 11 April 2017, the Government informed the court that the missing exhibit had been prepared but that Appellant's trial defense counsel had requested more time to review the correction. The Government requested the deadline be extended. The new deadline, 28 April 2017, was met and the record returned to this court.

We find no prejudice to Appellant resulting from the delay in the issuance of this opinion. When there is no showing of prejudice under the fourth factor, "we will find a due process violation only when, in balancing the other three factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). That is not the case here.

We have also considered whether Appellant is due *Tardif* relief because of the violation of the *Moreno* standards in this case. *United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002). This court set out a non-exhaustive list of factors we consider when evaluating the appropriateness of *Tardif* relief in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd* 75

M.J. 264 (C.A.A.F. 2016). Those factors include how long the delay exceeded appellate review standards, the reasons noted by the Government for the delay, whether the Government acted with bad faith or gross indifference, evidence of institutional neglect, harm to Appellant or the institution, the goals of justice and good order and discipline, and, finally, whether the court can provide any meaningful relief given the passage of time. *Id.* No single factor is dispositive and we may consider other factors as appropriate. *Id.*

On the whole, we find the delay, although presumptively unreasonable, to be justified upon application of the *Gay* factors. The length of the delay only exceeded the *Moreno* standard by 14 days. The 16-volume record of trial was substantial, exceeding 2200 pages of transcript as noted above. We also find no evidence of bad faith or gross negligence on the part of the Government for the delay. For these reasons, we conclude no *Tardif* relief is warranted.

### III. CONCLUSION

The findings of guilt to Charge V and its Specification and to the Additional Charge and its Specification are **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The remaining finding is correct in law and fact, and is **AFFIRMED**. The sentence is **SET ASIDE**. A rehearing on sentence is authorized. Article 66(c), UCMJ 10 U.S.C. § 866.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court